28 C.C.P.A.(Patents)

**FINCH v. DILLENBACK, Jr.**

Patent Appeals Nos. 4413 and 4414.

Court of Customs and Patent Appeals.
June 9, 1941.

Samuel Ostrolenk, of New York City
(Sidney G. Faber, of New York City, of
counsel), for appellant.

John J. Rogan, of New York City
(George Norris and Guy Atkinson, both of
New York City, of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

These are appeals in interference proceedings from decisions of the Board of Appeals of the United States Patent Office affirming the decisions of the Examiner of Interferences awarding priority of the inventions defined in counts 1, 2, and 3 in interference No. 73,335 (appeal No. 4413) and counts 1 to 11, inclusive, in interference No. 73,813 (appeal No. 4414) to appellee Garett Van Der Veer Dillenback, Jr.

■ No evidence was introduced by appellant in either of the involved interferences. Accordingly, he is confined to the filing dates of his applications which matured into the patents here involved for conception and constructive reduction to practice.

It was stipulated by counsel for the parties during the proceedings in the Patent Office that as the evidence introduced by appellee in interference No. 73,335 would be substantially the same as that introduced by him in interference No. 73,813 it might be considered with the same force and effect as though introduced in each interference. Furthermore, for the purpose of the hearing in this court, the records in the interferences were consolidated. Accordingly, we shall dispose of the issues involved in the two appeals in one opinion.

### Appeal No. 4413
### Interference No. 73,335

The interference is between appellant's patent No. 2,047,863, issued July 14, 1936, on an application, serial No. 65,869, filed February 26, 1936, and appellee's application, serial No. 107,524, filed October 26, 1936.

■ Appellee is the junior party, and as his application was filed subsequent to the issuance of appellant's patent the burden was upon him to establish priority of invention beyond a reasonable doubt.

The counts in issue originated in appellant's patent.

Count 1, which is illustrative of count 2, and count 3 read:

"1. In combination, a telephone line having a subscriber station including a phone-box unit at opposite ends thereof; an induction coil in each phone-box unit connected in said line at each of said stations; a transmitter for generating a carrier wave modified by signals; inductance means coaxial with one of said induction coils for electrically inducing said generated signals into said line when said stations are in operative connection; means coupled with the other of said induction coils for picking-up said signals; and a receiver connected to said last mentioned means to be operated by said picked-up signals."

"3. In a system for transmitting picture signals over a telephone line having a subscriber station with a phone-box at each end thereof and an induction coil in each phone-box, *a source of audio-frequency carrier current, means* for generating signals in accordance with the shading of a picture to be transmitted and *for modulating said audio frequency current;* means controlled by said signals for electrically inducing corresponding signals into one end of said telephone line comprising a solenoid cooperable with the induction coil at said first end of the telephone line; a receiving station coupled with the other end of said telephone line having means for receiving said picture signals and means for translating said signals." (Italics ours.)

The invention in issue relates to a system or a combination of elements (each of which elements the Primary Examiner stated was old per se), for the transmission of picture signals over a telephone line, wherein picture transmission apparatus is associated or coupled to a telephone line by means of "inductive coupling," as set forth in the counts in issue.

During the motion period, appellant moved to dissolve the interference on the ground that appellee had no right to make the claims constituting the counts in issue.

The motion was overruled by the Primary Examiner.

It is not contended here by counsel for appellant that appellee is not entitled to make counts 1 and 2, and apparently the issue of appellee's right to make those counts was not raised before the Board of Appeals. However, it is contended here by counsel for appellant, as it was before the Board of Appeals, that appellee is not entitled to make count 3 for the reason that that count calls for *"a source of audio-frequency carrier current"* and means "for modulating said audio frequency current" (italics ours), and that, although appellee discloses means for producing a *modulated carrier current,* he does not disclose *a*

*source of unmodulated carrier current* and means for modulating such carrier current.

The Primary Examiner held, and his holding has not been questioned, that appellant discloses in his patent a source of audio-frequency carrier current and, in addition thereto, means for modulating said audio-frequency carrier current.

For the purpose of clarity, we here reproduce figure 1 of appellee's application:

Fig. 1.

In his original decision holding that appellee disclosed a source of audio-frequency carrier current and means for modulating such audio-frequency carrier current, and that, therefore, he was entitled to make count 3 here in issue, which was numbered count 5 in the interference as originally declared, the Primary Examiner said:

"In Dillenback's disclosure the light source 5, rotating chopper disc 4, and cell 9 generate a carrier wave. The light from source 5 is projected in the form of a spot of elemental area upon the picture 1. *The output of cell 9 will then be an audio-frequency carrier current modulated in accordance with the picture current signals.*

"Finch argues that Dillenback generates directly a modulated carrier; that he does not "separately" generate a carrier and then modulate that carrier as Finch does and here claims; and Dillenback does not modulate a current. The word "separately" is not in the count.

\* \* \*

"Dillenback generates an audio frequency current when the picture 1 is stationary. Changes in shading of the picture generates signals in accordance with the shading of the picture to be transmitted when chopper disc 4 is stationary. When both picture and disc are moving *photocell 9 is an element of the . means for generating audio frequency current and an element of the means for generating signals in accordance with the shading of a picture to be transmitted and for modulating said audio frequency current.*" (Italics ours.)

In his decision on appellant's motion for reconsideration of his original decision, the Primary Examiner said:

"Dillenback discloses a system of light modulation embodying a light chopper for *generating a carrier current* similarly to Howey. *This is his source of carrier current.* Preferably, the number of perforations in the disc 4 is chosen and the disc speed is such that the regular frequency current from the cell 9 is of an audio-frequency, for example 1300 cycles per second, see page 3 of his specification. Further on this same page he describes the output of cell 9 as 'an audio-frequency carrier current modulated in accordance with the picture current signals'.

"*Dillenback generates a carrier current by means of light reflected from cylinder 2 and modulates this carrier current by*

*moving picture 1 in the light path.*" (Italics ours.)

In his decision the Examiner of Interferences stated, *inter alia:* "It is true that in the first instance the energy is in the form of light rays but *these light rays are changed to electric current by the photoelectric cell and the light chopper seems to be as much a source of audio-frequency carrier current as any other means.*" (Italics not quoted.)

The Board of Appeals stated in its decision that count 3 "does not specify means which operate in succession in producing the modulated carrier current and we believe, therefore, that when the party Dillenback *produces simultaneously a modulated carrier current, he has provided a means for producing the carrier current and a means for modulating it.*" (Italics not quoted.)

Appellee, in describing the apparatus disclosed in figure 1, states in his application that the picture to be transmitted may be wrapped around the cylindrical drum 2, and that—

"\* \* \* the drum 2 is driven from a synchronous motor 3 at the proper speed and also driven by motor 3 is an interrupter or chopper disc 4 having a series of perforations around its margin for purposes about to be described.

"Associated with the scanning drum is a source 5 of steady light preferably capable of producing a concentrated· spot of light. Positioned in front of source 5 is a suitable condensing lens system 6 by means of which the light from source 5 is projected in the form of a spot of elemental area upon the picture 1. Also associated with the scanning drum 2 is an objective lens for collecting the reflected light from the illuminated elemental area of the picture and focussing it upon the aperture in the apertured diaphragm 8. Suitably mounted adjacent the aperture in diaphragm 8 is a light sensitive cell 9, preferably although not necessarily of the Elster-Geitel type. The electro-optical system is so arranged that the reflected light beam 10 passes through the marginal perforations in the rotating disc 4. *Consequently as the picture is being scanned, there is produced in the output of cell 9 a current having a regular frequency determined by the number of times per second the disc 4 interrupts the light beam 10,* and this current will have instantane-

ous amplitude variations determined by the shade characteristics of the successive elemental areas of the picture 1. Preferably the number of perforations in the disc 4 is chosen and the disc speed is such *that the regular frequency current from the cell 9 is of an audio-frequency,* for example 1300 cycles per second. *The output of cell 9 will then be an audio-frequency carrier current modulated in accordance with the picture current signals.* It will be understood of course that any other well-known method of translating the picture shade characteristics into a correspondingly modulated audio-frequency carrier current may be employed." (Italics ours.)

On cross-examination appellee testified that the function of the interrupter or chopper disc, which he referred to as a "light chopper," is "to make the output of the transmitter in the form of a modulated carrier which would be handled over the telephone lines. In the absence of the light chopper, the amplifier used and the telephone lines themselves would not be able to transmit picture signals." He further stated that in his opinion the light leaving the chopper disc is in the "form of a modulated carrier before it reaches the photo-cell," and *that such modulated carrier was not a carrier current* but a "light carrier." We quote further from his testimony:

"XQ236. You mean that the light is modulated by the light from the scanned pictures? A. The resultant light after it has passed through the *light chopper consists of a carrier current in the form of a pulsating light beam upon which is superimposed a modulation introduced by the scanning* of the picture.

"XQ237. Well, let us be clear and consistent, Mr. Dillenback. You stated it was not a carrier current but a carrier light? A. *It is a carrier. Instead of being in the form of an electric current it is in the form of a light beam.*

"XQ238. *And a light beam is exactly the same as an electric current?* A. *I did not say that. The light beam can be a carrier. Sound can be a carrier. Whenever you talk, you make use of the principle of a modulated carrier.*
* * *

"XQ239. In Figure 1 of your patent application, you show a single source of light which is reflected from the picture scanned and intercepted by the chopper disc. Where is the light carrier there, if you say that a light carrier is present when you chop a beam by a chopper disc? A. May I see the diagram referred to?
* * *

"A. (continued) The light carrier is present here between the chopper disc and the photo-cell. It consists of a pulsating beam of light which varies in intensity with the light and shade of the picture being scanned. In other words, it carries picture modulations superimposed upon it." (Italics ours.)

It further appears from the testimony of appellee and from other testimony of record that appellee had used a generator for producing an unmodulated carrier current prior to the filing of his involved application.

We think it is clear from what has been said that appellee's application contains no disclosure of a source of audio-frequency carrier current and means for modulating such audio-frequency carrier current. On the contrary, in appellee's disclosure, a modulated light beam is translated into a modulated audio-frequency carrier current by his photo-electric cell 9.

We are of opinion that the language in count 3—"*a source* of audio-frequency carrier current, *means* for generating signals in accordance with the shading of a picture to be transmitted and *for modulating said audio frequency current*"—is unambiguous and calls for a source of audio-frequency carrier current and, in addition thereto, means for modulating such audio-frequency carrier current. However, if that language is open to more than one interpretation and is, therefore, ambiguous it should be construed in the light of appellant's patent where the count originated and where there is a clear disclosure of a source of audio-frequency carrier current and, in addition thereto, means for modulating such audio-frequency carrier current. Ernest M. Brogden v. Henry B. Slater, 40 F.2d 988, 17 C.C.P.A., Patents, 1240; In re Alexander M. Nicolson, 49 F.2d 961, 18 C.C.P.A., Patents, 1468; Neumair v. Malocsay, 77 F.2d 622, 22 C.C.P.A., Patents, 1349; Hausman v. Hochman, 83 F.2d 703, 23 C.C.P.A., Patents, 1162; Bray et al. v. Tears, 102 F.2d 877, 26 C.C.P.A., Patents, 1103.

Counsel for appellee state in their brief that appellee's application discloses a "sep-

arate alternator, and [that] the production model of the transmitter which was used prior to January, 1936, and including Exh. D-73, also employed a separate alternator for generating the carrier in place of the light chopper means [disclosed in appellee's application] for generating the carrier."

■ We have been unable to find any disclosure of a "separate alternator" or generator for producing an audio-frequency carrier current in appellee's application.

In view of the fact that the question under consideration is whether appellee's application here involved discloses the invention defined in count 3, we are not here concerned with the fact that such a "separate alternator" or generator was well known in the art or that appellee had used such a device for producing an audio-frequency carrier current in his experiments and tests prior to or subsequent to the filing of appellant's application which matured into patent No. 2,047,863. We must therefore, that there is no disclosure in appellee's application of a source of audio-frequency carrier current and means for modulating such audio-frequency carrier current as called for in count 3, and that appellee, therefore, is not entitled to make that count.

It appears from the record that appellee suggested to the witness Austin G. Cooley the idea of using an "inductive coupler" in an apparatus for the transmission of picture signals over a telephone line on November 25, 1934; that, as early as January 29, 1935, an apparatus, including an "inductive coupler" was constructed and successfully operated; that during the month of February 1935 pictures were transmitted with such an apparatus from Chicago, San Francisco, and Los Angeles to New York; and that during the month of June 1935 apparatus including an "inductive coupler" was again successfully operated and pictures transmitted.

It is contended, however, by counsel for appellant that the evidence introduced by appellee does not establish that his inductance means was arranged to be coaxial with the induction coil in the telephone box as called for in counts 1 and 2.

It clearly appears from the evidence introduced by appellee that in his various reductions to practice, hereinbefore referred to, the transmitter inductance means or coil was placed on the telephone box and moved around thereon until the "loud-est signal, which * * * made for better transmissions," was obtained. There is no evidence that appellee's witnesses actually examined the induction coil in the telephone box and arranged the inductance coil and the transmitter coaxially therewith. However, as stated by the Examiner of Interferences, "the adjustment [by appellee and his witnesses] of the coil to different positions [on the telephone box] until maximum signal is obtained in the telephone receiver is exactly the method Finch sets forth in his patents for obtaining optimum or coaxial coupling."

In appellant's patent here involved it is stated, among other things, that—"The transmitter solenoid * * * is placed adjacent to the induction coil * * * to provide for optimum induction of the telecommunications signals therein. I have found that when the axis * * * of [the] solenoid * * * coincides with the axis of the induction coil * * * maximum signal energy transfer is had. The solenoid * * * is placed as close as practicable to the one end of [the] induction coil * * * to insure maximum signal induction." The patentee also states that the "region of optimum coupling is determined in the following manner. The audio frequency carrier or tone from [the] generator * * * is introduced to the line through [an] amplifier * * * and impressed upon [the] solenoid * * * as hereinabove described. *This operation is preliminary to the transmission of the telecommunication signals for optimum adjustments of the transmitting and receiving apparatus.*" (Italics not quoted.)

In view of the fact that appellee used the same method for obtaining maximum signal induction as that set forth in appellant's patent, by means of which method, appellant stated in his patent, the "transmitter solenoid" would be in coaxial arrangement with the induction coil in the telephone box, it would seem to be clear, if there was no other evidence of record on the subject, that appellee had established that his transmitter inductance means and the induction coil in the telephone box were in coaxial arrangement. However, appellee testified that by placing the inductance means "near" the induction coil in the telephone box, the strongest signal would be secured and that, although the best results were obtained when the transmitter coil or inductance means was in that position, "it worked so well in

other positions that we had no call to operate it in that position." Furthermore, appellee's witness Austin G. Cooley, who was familiar with the apparatus used by appellee in the transmission of pictures and who aided in such transmission, stated that, although the "inductive coupler" used to couple the picture transmitter to the telephone line was placed near the induction coil in the telephone box, they (meaning the witness and appellee) had no definite position that they adhered to; that it was not necessary to locate the inductive coupler in any exact position; and that the adjustment of the inductive coupler relative to the telephone box was not critical. Furthermore, appellee stated in his involved application that: "In some telephone boxes the induction coil is situated adjacent the top of the box and in others it is situated near the bottom of the box. It is quite obvious therefore that the magnet 15 [inductance means] should be so positioned with respect to box 18 [telephone box] as to provide the maximum electro-magnetic coupling to the said induction coil, *often, although not necessarily, with the poles of the magnet approximately coaxial with the induction coil.*" (Italics not quoted.)

In view of the testimony hereinbefore referred to and the teachings in appellee's application that it was not necessary, in order "to provide the maximum electro-magnetic coupling to the said induction coil" in the telephone box, that the transmitter inductance means and the induction coil in the telephone box be in approximate coaxial arrangement, it would seem to be clear that, although appellee *may* have placed his transmitter inductance means in coaxial relation with the induction coil in the telephone box in his several reductions to practice of his system for the transmission of picture signals over a telephone line, he has failed to establish beyond a reasonable doubt that in any of such reductions to practice his transmitter inductance means was, in fact, in coaxial relation with the induction coil in the telephone box. However, the Examiner of Interferences and the Board of Appeals concurred in holding that appellant derived the inventive subject matter defined in counts 1 and 2 from appellee, and that appellant, therefore, was not an original inventor of the invention defined in those counts.

We shall now proceed to consider that issue.

Appellee's witness Fred E. Meinholtz testified that he was manager of "Communications" of the New York Times, a director and secretary of News Traffic Board, Ltd., and also a director and secretary of Press Wireless, Inc.; that he was familiar with appellee's apparatus for the transmission of picture signals over a telephone line, in which apparatus the transmitter was inductively coupled with the telephone line; that he had observed appellee's inductive coupler, identified in the record as exhibit D-18, placed over the telephone box and fitted around it immediately prior to the transmission of pictures by appellee's apparatus; that he was present when several tests were made of appellee's apparatus; that he had known appellant since about 1924; that during the month of March 1935 appellant was an engineer in the employ of the Federal Communications Commission in Washington, D. C., and in charge of the telephone division; that sometime during that month he met appellant outside the hearing room of the Federal Communications Commission and went to appellant's office with him; that he then and there disclosed to appellant the "complete story" of appellee's apparatus and his process of transmitting pictures over the telephone line by means of an inductive coupler.

Appellee's witness Keith S. McHugh, vice president of the American Telephone and Telegraph Company, testified that on August 28, 1935, he talked with appellant and other representatives of the Federal Communications Commission—"Messrs. Finch, Roberson, O'Shaughnessy, Stark and Butts"—in appellant's office, and that during that conversation the use of an inductive coupler in the transmission of pictures over a telephone line was discussed.

That counsel for appellant was aware of the seriousness of the statements made by the witness McHugh as well as those made by the witness Meinholtz to the effect that appellant was not an original inventor, is clearly indicated by the following statement made by counsel to the witness McHugh during his cross-examination: "Mr. McHugh, I want you to understand that your testimony, and you are the second witness who has testified along this line, *is of a nature which charges Mr. Finch with having, when he was an officer of the United States Government, stolen an idea he received in confidence while he was*

*an officer. I cannot permit you to slur over exactly what you told him, because the nature of your testimony is very serious. We do not intend to stop merely with your testimony; we are going to investigate it further, and I am very happy all these other people were present when you gave all this very valuable information to Mr. Finch, which he stole, according to your testimony."* (Italics not quoted.) In reply to that statement, the witness McHugh stated that he was not making any effort to charge appellant "with stealing anything"; that he was subpoenaed to testify in this proceeding; and that he only knew in a "general sort of way" the issues involved. The witness further stated that he was satisfied that everyone present at the conference in appellant's office understood probably better than he "what inductive coupling was."

With full knowledge of the seriousness of the charge being made against him, that is, that he derived the invention from appellee's witnesses, appellant, nevertheless, did not testify nor did he call anyone to testify in his behalf, although, in view of the statement of counsel to appellee's witness McHugh, it may be presumed that those present at the conference in appellant's office were interrogated either by appellant or his counsel as to the accuracy of McHugh's testimony. Under such circumstances, we must accept the testimony of the witnesses Meinholtz and McHugh, particularly that of Meinholtz, as establishing beyond a reasonable doubt that, with the exception of the limitation contained in counts 1 and 2 that the transmitter inductance means is coaxial with the induction coil in the telephone box, appellant derived the invention defined in those counts from appellee and that he is not an original inventor of a system or a combination of elements for the transmission of picture signals over a telephone line wherein a picture transmission apparatus is coupled to a telephone line by means of an inductive coupler. Winslow v. Austin, 14 App.D.C. 137; Kempshall v. Royce, 29 App.D.C. 181, 187; Hewlett v. Steinberger, 40 App.D.C. 287, 293.

It is true that the limitation that the inductance means is coaxial with the induction coil in the telephone box, contained in counts 1 and 2, was not disclosed to appellant by either the witness Meinholtz or McHugh. However, both the Examiner of Interferences in the instant interference and the Board of Appeals in the companion interference (No. 73,813, in which the same issue was decided) held that that particular limitation in the counts would be obvious to one skilled in the art and, therefore, did not lend patentability to the involved counts, and that the disclosure to appellant by appellee's witnesses was sufficiently full and clear to enable appellant to practice the invention defined in counts 1 and 2 without the exercise of anything more than mere mechanical skill.

We are unable to hold on the record before us that the tribunals of the Patent Office erred in that respect.

In view of the fact that the disclosure to appellant by appellee's witnesses was sufficient to enable appellant to practice the invention defined in counts 1 and 2 without the exercise of anything more than mere mechanical skill, we must hold that appellant is not an original inventor of the subject matter defined in those counts. Alden v. Dewey, 1 Fed.Cas. page 329, No. 153; Rolfe v. Kaisling, 32 App.D.C. 582, 589. See also Davis v. Carrier, 81 F.2d 250, 23 C.C.P.A., Patents, 844, and King v. Burner, 90 F.2d 343, 24 C.C.P.A., Patents, 1312.

For the reasons stated, the decision of the Board of Appeals is modified, being reversed as to count 3 and in all other respects affirmed.

Modified.

### Appeal No. 4414
### Interference No. 73,813

The interference is between appellant's patent No. 2,048,604, issued July 21, 1936, on an application filed March 24, 1936, serial No. 70,591 which is a division of his application No. 65,869 which matured into patent No. 2,047,863 (involved in interference No. 73,335), and appellee's application, serial No. 107,524, filed October 26, 1936.

Appellee is the junior party and, as his application was filed subsequent to the issuance of appellant's patent, the burden was upon him to establish priority of invention beyond a reasonable doubt.

The counts in issue (Nos. 1 to 11, inclusive) originated in appellant's patent.

Counts 1, 2, and 10 are illustrative of the counts here involved. They read:

"Count 1. A transmitter for telepicture systems comprising a telephone box for housing telephone apparatus of a telephone system including an induction coil connected in the telephone system, a solenoid secured to said telephone box and arranged to be coaxial with said induction coil, means for inducing picture signals across said solenoid, and means for adjusting said coil in the coaxial line with said induction coil to obtain optimum coupling condition.

"Count 2. A transmitter for telepicture systems comprising a telephone box for housing telephone apparatus of a telephone system including an induction coil connected in the telephone system, a pair of solenoids connected in parallel and secured to said telephone box, means for impressing picture signals in phase across said solenoids, and a common yoke for mechanically supporting said coils."

"Count 10. In a system for transmitting electrical signals over a telephone line having a subscriber station with a phone box, means for generating a carrier wave modulated by signals to be transmitted; means comprising a solenoid secured to said box controlled by said signal-modulated carrier wave for generating an electrical field to electrically induce corresponding signals into one end of said telephone line; means for adjusting said solenoid for maximum efficiency, and a receiving station associated with the other end of said telephone line for receiving and translating said signals."

Counts 1 and 2 define a transmitter for telepicture systems.

Count 1 calls for a transmitter for telepicture systems comprising a telephone box for housing telephone apparatus including an induction coil connected in the telephone system, a solenoid secured to the telephone box and in coaxial arrangement with the induction coil therein, means for inducing picture signals across the solenoid, and means for adjusting the solenoid in coaxial relation with the induction coil in the telephone box "to obtain optimum coupling condition."

Count 2 is similar to count 1 except that it calls for a pair of solenoids connected in parallel.

The invention defined in count 10 relates to a system or a combination of elements for the transmission of picture signals over a telephone line, wherein picture transmission apparatus is coupled to a telephone line by means of an inductive coupler, and a receiving station associated with the "other end" of the telephone line for receiving and translating such picture signals.

Although it is claimed in appellant's reasons of appeal that the Board of Appeals erred in several respects, the only contentions made here in the brief of counsel for appellant are that the board erred in holding that the evidence introduced by appellee was sufficient to establish beyond a reasonable doubt that the inductance means in his transmission apparatus (as explained in interference No. 73,335) was in coaxial relation with the induction coil in the telephone box, and that appellant derived the invention from appellee. Accordingly, all other issues raised by appellant's reasons of appeal will be considered to have been abandoned.

Both of the issues raised here in appellant's brief have been fully discussed and determined in companion appeal No. 4413, interference No. 73,335, and need not be here further discussed.

After the record filed with the clerk of this court had been printed, counsel for appellee moved that certain of appellee's documentary exhibits, duly certified as a part of the record in these appeals but not included in the record as originally printed, be printed as a supplement to the record.

Counsel for appellant agreed that some of those exhibits should be printed at the expense of appellant, but objected to the printing of exhibits D–1, D–2, D–34, D–46, D–47, D–61, D–63, D–93, D–99, D–108, D–109, D–110, D–126, D–128, D–131, D–132, and D–133 on the ground that they were not material to the issues raised in this court.

The exhibits objected to by counsel were ordered printed by the court, the cost of such printing to be "taxed upon decision."

All of those exhibits, except D–1 and D–2, were pertinent to the issues raised here by counsel for appellant and, therefore, should have been included in the printed record. Accordingly, the cost of printing exhibits D–1 and D–2 will be taxed against appellee, and the cost of printing the other exhibits in controversy will be taxed against appellant.

For the reasons stated in our decision in interference No. 73,335 relative to

counts 1 and 2 there involved, the decision of the Board of Appeals is affirmed.

Affirmed.